ARTHUR YIAKAS & another[1] *vs.* ROBERT F. SAVOY, trustee,[2]
& another.[3]

No. 87-1342.

Hampden.   May 13, 1988. — August 12, 1988.

Present: PERRETTA, DREBEN, & KASS, JJ.

*Contract,* What constitutes, Sale of real estate. *Real Property,* Sale. *Evidence,* Best and secondary. *Unlawful Interference.*

In a civil action, the judge correctly determined that a purchase and sale agreement was a binding contract; that in the circumstances the buyer was entitled to a reasonable time to procure a letter of credit as a deposit before the seller was entitled to withdraw from the agreement; that the letter of credit submitted by the buyer was sufficient under the agreement; and that the buyer's mailing of his acceptance of the seller's counteroffer was a reasonable form of acceptance. [313-314]

The judge in a civil action properly accepted as evidence copies of certain contract documents. [314]

In a civil action in which the plaintiff sought the conveyance of real property under a purchase and sale agreement from one defendant and damages from another defendant for interference with contractual relations, there was insufficient evidence that the second defendant knew of the plaintiff's agreement and knew she was interfering with it when she signed a purchase and sale agreement for the same property to support a judgment for the plaintiff on that claim. [314-316]

CIVIL ACTION commenced in the Superior Court Department on October 25, 1985.

The case was heard by *William H. Welch,* J.

*William K. Danaher, Jr.,* for Robert F. Savoy.

*Efrem A. Gordon* for Yu-Man Suen.

*David B. Kaplan* for Arthur Yiakas.

[1] Edward Rosenberg.

[2] Trustee of Hotel Charles Realty Trust.

[3] Dr. Yu-Man Suen.

DREBEN, J. As seller of the Hotel Charles in Springfield, Robert F. Savoy, trustee, purported to accept another offer at a time when he had already signed documents for its purchase by the plaintiff Yiakas. At issue is whether a binding contract had been entered into with Yiakas when Savoy negotiated the second agreement with Dr. Yu-Man Suen. We hold that Yiakas had a binding contract. Accordingly, we affirm the judgment insofar as it orders conveyance of the property to Yiakas and payment of a commission to the broker, Edward Rosenberg. We reverse that portion of the judgment ordering Dr. Suen to pay attorneys' fees to Yiakas because we do not consider that the findings of the trial judge support his conclusion that Dr. Suen improperly induced Savoy to break his contract with Yiakas.

1. *Action against the seller.* The evidence was conflicting. Contrary to the defendants' contention, the judge's findings are not clearly erroneous, and we take our facts from those findings. Yiakas was introduced to the seller by Rosenberg, and, after some negotiations, an agreement on a Greater Boston Real Estate Board form was prepared by Yiakas's attorneys in Boston. As signed by Yiakas, the agreement called for a deposit of $50,000, which was to be satisfied by a letter of credit. The agreement was delivered on October 15, 1985, to the seller's attorney in Springfield. The latter made a few changes, the most important being an amendment which read: "Seller shall not be bound, no matter what the circumstances unless and until a satisfactory Letter of Credit is delivered to the Seller's Attorney Donald P. Conway, 71 Park Avenue, West Springfield, Mass. 01089 to serve as deposit under this agreement."

On October 17, Rosenberg took the revised agreement to Savoy, who signed it that day. Rosenberg next took the agreement to Yiakas in Boston. After Yiakas signed the amendment on Friday, October 18, 1985, Rosenberg called Savoy, told him the agreement was in the mail, and sent a completed copy to Savoy by letter dated October 18, 1985.

The following Tuesday morning (October 22) at 9:00 A.M., Rosenberg called Mr. Conway, the seller's lawyer, to inform

him that Yiakas had applied for the letter of credit and that Rosenberg could bring it up that day. Mr. Conway told Rosenberg that Yiakas could bring the letter of credit on October 23, the day Yiakas was to examine the property with the bank which was to finance the purchase. During the same telephone conversation, Rosenberg reminded Mr. Conway that he still had to prepare an indemnification letter (earlier agreed to by Savoy) protecting Yiakas against claims of other brokers. Mr. Conway agreed to provide the letter.

Despite these arrangements of Tuesday morning, on Tuesday afternoon Savoy and Dr. Suen, a person who had shown interest in buying the hotel several weeks earlier, discussed her desire to buy the hotel. Dr. Suen was not a real estate developer (she was an acupuncturist), and she was not fluent in English.[4] Mr. Conway talked to Dr. Suen's lawyer, telling him that an offer had been made. Mr. Conway showed them the agreement and said he expected the papers the next day. "Relying on a belief that there was no legal contract or binding obligation on Savoy until a 'satisfactory letter of credit was delivered to Conway,' Savoy with Conway's advice entered into another [more favorable[5]] purchase and sale agreement with Dr. Suen . . . at 7:00 P.M. on October 22."

The next morning, October 23, at 7:55 A.M., Mr. Conway sent a telegram to Yiakas's attorney, stating: "advise withdraw of Savoy signature to October 85 agreement as no letter of credit received and property sold to third party." Mr. Conway also sent Yiakas's attorney a letter which stated that no satisfactory letter of credit had been received and which, contrary to the facts found by the judge, also stated that "no properly executed agreement was received either by our client or this office." On October 23, Rosenberg delivered a copy of the

---

[4] This description of Dr. Suen's occupation and lack of knowledge of English was not expressly found by the judge, but it is apparent from the record.

[5] The purchase price for Dr. Suen was $930,000 as compared with $900,000 for Yiakas. The Suen agreement also called for a deposit of $250,000 and permitted Savoy to use $100,000 of it immediately.

letter of credit to Mr. Conway's office. Later that day, Mr. Conway returned it.

Based on these findings, the judge concluded that when Yiakas in Boston and Savoy in Springfield entered into the agreement on October 18, 1985, they contemplated that Yiakas would have a reasonable time to produce a letter of credit satisfactory to Mr. Conway and that Yiakas had moved promptly to procure one. He concluded that Savoy had an obligation to allow Yiakas a reasonable opportunity to secure the letter and had denied Yiakas that opportunity, particularly since Mr. Conway had told Rosenberg that Yiakas had until Wednesday, October 23, to bring the letter of credit. The judge held that Yiakas had at least until that date to produce it.

We see no error in these conclusions. Although the seller urges that delivery of a satisfactory letter of credit was a condition on the *formation* of a contract and that this condition of acceptance did not occur before the Savoy counter offer was revoked, we agree with the judge's interpretation that a binding contract had been formed once both parties had signed the comprehensive purchase and sale agreement. Implicit in that agreement was the term that Yiakas had a reasonable time to procure the letter.[6] Of course, if he failed to do so, the seller would be relieved of performance.

The behavior of the seller as manifested to the buyer supports this interpretation. Mr. Conway told Rosenberg he had until the next day to provide the letter of credit and also told him he would provide the earlier agreed upon letter indemnifying Yiakas from claims of other brokers. These actions indicated to the buyer that Mr. Conway considered that an agreement had been reached. As in *Hunt* v. *Rice*, 25 Mass. App. Ct. 622, 629 (1988), where we rejected a like argument that a contract had not been formed, we conclude that the condition inserted by Savoy in this comprehensive purchase and sale agreement was not a condition precedent to the formation or

---

[6] "A promise may be lacking, and yet the whole writing may be 'instinct with an obligation,' imperfectly expressed. If that is so, there is a contract" (citations omitted). *Wood* v. *Lady Duff-Gordon,* 222 N.Y. 88, 91 (1917) (Cardozo, J.).

acceptance of the agreement. Once both parties had manifested assent to Savoy's additional terms, Savoy was precluded from withdrawing prior to giving Yiakas a reasonable time to procure the letter of credit, especially after having led him to believe (by reason of Mr. Conway's statements to Rosenberg) that he had until October 23 to do so. See *Cellucci* v. *Sun Oil Co.*, 2 Mass. App. Ct. 722, 728 (1974).

Savoy also argues that, in the event he was under a good faith obligation to await delivery of the letter, the letter which was ultimately submitted was unsatisfactory. Even disregarding the important circumstance that neither Savoy nor Mr. Conway looked at the letter before terminating, we conclude that there was no error in the judge's determination that the letter was sufficient. The purchase and sale agreement did not specify what terms were required, and there was testimony of a bank vice president that it was a standard letter of credit.

We find no merit in any of Savoy's other claims. In view of the distance between the parties, mailing of Yiakas's acceptance of Savoy's counter offer was a reasonable form of acceptance. Restatement (Second) of Contracts § 30(2) (1981) ("Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances").

The judge did not abuse his discretion in accepting copies of the contract documents. See *Fauci* v. *Mulready*, 337 Mass. 532, 540 (1958). See also Liacos, Massachusetts Evidence 372 (5th ed. 1981).

2. *Action against Dr. Suen.* The judge found that on Tuesday afternoon there were discussions between Savoy and Dr. Suen concerning her desire to buy the hotel, that she "knew a contract had been concluded since she was shown the Yiakas contract and was told they were awaiting return of papers," that "Conway, Dr. Suen and Dr. Suen's lawyer . . . were all acting on the belief that Savoy was free to enter into contracts with others until the satisfactory letter of credit was received by Conway," and that "Conway did not inform Suen or her attorney that he had told Rosenberg he could bring the letter of credit up [on] Wednesday, October 23." The judge held Dr. Suen liable for

Yiakas's attorney's fees because her "actions have delayed the transfer of the property and required the plaintiff to commence this action." In her cross claim seeking damages against Savoy, Dr. Suen was entitled, the judge ruled, to be reimbursed for these fees by Savoy, "particularly since he misled her by not revealing Yiakas had been given time until October 23 to provide the letter of credit."

The judge's findings fall short of establishing interference with contractual relations. As stated in *Chemawa Country Golf, Inc.* v. *Wnuk*, 9 Mass. App. Ct. 506, 509 (1980), quoting from *Walker* v. *Cronin*, 107 Mass. 555, 562 (1871), the elements of the tort of interference with contractual relations are: "(1) intentional and wilful acts (2) calculated to cause damage to the plaintiffs in their lawful business, (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendant, (which constitutes malice), and (4) actual damage and loss resulting."

In order for the acts to be intentional and wilful, the actor must have knowledge of the contract and must know that he is interfering with its performance. Restatement (Second) of Torts § 766 comment i (1979). *Ryan, Elliott & Co.* v. *Leggat, McCall & Werner, Inc.*, 8 Mass. App. Ct. 686, 691 (1979). While it is not necessary that the actor know the legal significance of the relevant facts concerning a contract to find liability, he must be fully informed as to those facts. See *Ryan, supra*; *Engine Specialties, Inc.* v. *Bombardier Ltd.*, 330 F. Supp. 762, 768 n.5 (D. Mass. 1971), affd. 454 F.2d 527 (1st Cir. 1972). Here, the judge specifically found that Mr. Conway did not inform Dr. Suen or her attorney that he had told Rosenberg that the letter of credit could be brought on October 23. He also found that she and her lawyer "were . . . acting on the belief that Savoy was free to enter into contracts with others until the satisfactory letter of credit was received by Conway." The record indicates that Dr. Suen was not fluent in English and had no background in real estate.[7]

---

[7] Mr. Conway testified that he had discouraged Dr. Suen from buying the property, not because of the Yiakas negotiations but because she "was a novice in this area," having "no background in the hotel field."

In these circumstances, and where Dr. Suen was not informed that Yiakas had been told that he had until the next day to procure the letter of credit, we think the mere showing to Dr. Suen of the contract papers did not make her fully aware of the relevant facts concerning Yiakas's negotiations. We also note that it is plain that Dr. Suen did not intend to interfere with Yiakas's contract and was not aware she was doing so. See Restatement (Second) of Torts § 767 (1979, nature of the actor's conduct and his motive are important factors in determining whether interference improper).

There is no question here of an improper interference with an expected contractual relationship. "A competitor may 'interfere' with another's contractual expectancy by picking the deal off for himself, if, in advancing his own interest, he refrains from employing wrongful means." *Doliner* v. *Brown*, 21 Mass. App. Ct. 692, 695 (1986). Restatement (Second) of Torts § 768 (1979).

The judgment is reversed insofar as it orders payment by Dr. Suen to Yiakas of his attorney's fees and the reimbursement thereof by Savoy. Judgment is to be entered for Dr. Suen in the action against her by Yiakas, and that portion of the judgment ordering Savoy to reimburse her for Yiakas's attorney's fees is to be deleted. In all other respects the judgment is affirmed.

*So ordered.*